1   WO

2

3

4

5

6

7                IN THE UNITED STATES DISTRICT COURT

8                  FOR THE DISTRICT OF ARIZONA

9

10

11

12   Edward Harrison and          )
     Carol Harrison, husband and  )
13   wife,                        )
                                  )
14              Plaintiffs,       )    No.  CIV 06-0745 PHX RCB
                                  )
15         vs.                    )         O R D E R
                                  )
16   Howmedica Osteonics Corp.,   )
     et al.                       )
17                                )
                Defendant.        )
18   ─────────────────────────────)

19        Currently there are four motions pending before the court in

20   this product liability action.  The first, jointly filed, is a

21   motion by defendant Howmedica Osteonics Corporation ("Howmedica"),

22   to "exclude" the testimony of the metallurgist retained by

23   plaintiffs, Robert Anderson, Ph.D., and to strike "his reports in

24   their entirety[,]"[1] as well as a motion for summary judgment (doc.

25   48).  Second, because plaintiffs did not timely respond, Howmedica

26   is moving "for summary adjudication" of that joint motion (doc.

27   52).  Third, Howmedica is moving "to strike plaintiffs'

28   controverting statement of facts" filed "in response to [its]

     ────────────────────────
          [1]      Reply (doc. 59) at 17.

1   motion to exclude" (doc. 60).   Fourth, Howmedica similarly moves

2   "to strike plaintiffs' controverting statement of facts" filed in

3   response to its summary judgment motion (doc. 63).

4                          ***Background***[2]

5        Unless otherwise indicated, "for purposes of this motion"

6   plaintiffs do not dispute the following facts.   See, e.g.,

7   Plaintiffs' Supplemental Controverting Statement of Facts ("PSSOF")

8   (doc. 68) at 1, ¶¶ 23-27.

9        While vacationing in Montana, on August 4, 2003, plaintiff

10  Edward Harrison sustained several injuries, including a fracture to

11  his right femur, in an all-terrain vehicle accident.   Amended Co.

12  (doc. 14) at 3, ¶ 14.   The next day, on August 5, 2003, to repair

13  Mr. Harrison's fractured femur, Dr. Christopher Price implanted a

14  IntraMedullary Long Gamma Nail ("LGN"[3]) manufactured and

15  distributed by defendant Howmedica.   Id. at 3, ¶ 18.   The LGN

16  "Operating Guide" describes the LGN as "a *load-sharing* device

17  designed to offer a faster, more successful, return to normal

18  lifestyles than alternative *load-bearing* devices such as plating or

19  complete reconstruction such as hip replacements."   DSOF (doc. 44)

20

21        [2]      Howmedica is moving to strike "Plaintiff's Controverting
22  Statement of Facts in Response to Defendant's Motion for Summary Judgment" ("PSOF")
    (doc. 54) because plaintiffs did not comply with LRCiv 56.1 in that they did not
23  "specifically controvert[] by a correspondingly numbered paragraph" any of the
    "facts" in Defendant Howmedica's Statement of Facts ("DSOF").   Based upon that
    noncompliance, Howmedica asserts that its Statement of Facts is deemed admitted.
24        Initially plaintiffs did not comply with LRCiv 56.1(b).   In response to this
    motion to strike, however, plaintiffs did file a "Supplemental Controverting
25  Statement of Facts" (doc. 66) complying with that Local Rule.   It would have been
    preferable for plaintiffs to have fully complied with LRCiv 56.1(b) from the
26  outset.   Given the extensive briefing which these motions have engendered, the lack
    of prejudice to Howmedica, and because plaintiffs admitted many of the facts in
27  DSOF, the court denies this motion to strike (doc. 63).

          [3]      All references to the LGN herein shall be read as including the screws
28  which were used to set and place the LGN.

at 6, ¶ 32; see also PSSOF (doc. 68) at 1.  According to that
Guide, the LGN is "superior to existing alternatives, because,
among other things, implantation is less invasive, it speeds
healing by allowing early weight-bearing and it is consistent with
activity levels that help a patient avoid complications brought on
by prolonged immobility such as muscle atrophy."  Id. (citation
omitted); see also PSSOF at 1.

    Plaintiffs admit that "[a]mong the risks understood by Dr.
Price and communicated to Mr. Harrison," were the following, which
are "specifically identified in the LGN's package insert[.]" Id. at
6, ¶ 34; see also PSSOF at 1.  First, "No fracture fixation device
that is subject to material fatigue can be expected to withstand
activity in the same way as would a normal healthy bone."  Id. at
6-7, ¶ 34 (quoting exh. J thereto (LGN Package Insert); see also
PSSOF (doc. 68) at 1.  The Insert continues: "The fracture fixation
system, therefore, will not be as strong, reliable or durable as a
normal human bone."  Id.  Under the section entitled "Intended
Use[,]" the Insert explains that "[t]he [LGN] is intended for the
temporary stabilization of bone segments or fragments until bone
consolidation has been achieved."  Id.  Also under the "Intended
Use" section, the Insert is explicit: "The patient should be warned
that the [LGN] cannot and does not replicate a normal healthy bone,
that the [LGN] can break or become damaged as a result of strenuous
activity or trauma, and that the [LGN] has a finite expected
service life[.]" Id.

    "Delayed union or non-union of the fracture site[]" is one of
the listed "Adverse Effects" in the Package Insert.  Id.  Another
specifically identified "Adverse Effect[]" is that "[i]f healing is

1  delayed or does not occur, the [LGN] may eventually break due to

2  metal fatigue." _Id._  As the Insert explains it, "Locas on the

3  [LGN] produced by load bearing and the patient's activity level

4  will dictate the longevity of the [LGN]." _Id._  Again, these were

5  "[a]mong the risks understood by Dr. Price and communicated to Mr.

6  Harrison[.]" _Id._ at 6, ¶ 34; _see_ _also_ PSSOF (doc. 68) at 1.

7       As part of his discharge instructions, on August 12, 2003, Dr.

8  Price "limited Mr. Harrison to weight-bearing with a front-wheeled

9  walker, in part to 'decrease the stress of the bone implant

10 system.'" _Id._ at 4, ¶ 23 (citing exh. D thereto (Price Dep'n) at

11 22:22-23); _see_ _also_ PSSOF at 1.  Plaintiffs agree with Dr. Price's

12 assessment that Mr. Harrison "was very inquisitive and . . . had a

13 good understanding of what the discharge plan was when he left."

14 _Id._ at 7, ¶ 35 (citation omitted); _see_ _also_ PSSOF (doc. 68) at 1.

15      Upon returning to Arizona, Mr. Harrison "reported for a

16 follow-up review of his implant surgery on August 26, 2003, to Dr.

17 David Camarata of Arizona Bone and Joint Specialists." _Id._ at 5,

18 ¶ 25 (citation omitted); _see_ _also_ PSSOF (doc. 68) at 1.  At that

19 time, and again on September 25, 2003 and on October 25, 2003, "Dr.

20 Camarata examined updated x-ray[s]" of Mr. Harrison's right femur.

21 _Id._ at 5, ¶ 26; _see_ _also_ PSSOF (doc. 68) at 1.  "On each of these

22 visits, Dr. Camarata's notes indicate he was satisfied with the

23 evidence of healing and alignment of the [LGN]." _Id._ (citation

24 omitted); _see_ _also_ PSSOF at 1.  During the course of those visits,

25 "Dr. Camarata directed Mr. Harrison to continue with physical

26 therapy and with weight-bearing as tolerated – graduating

27 eventually from a walker to a cane." _Id._ at 5, ¶ 27 (citation

28 omitted); _see_ _also_ PSSOF (doc. 68) at 1.

1    In contrast to the facts outlined above, plaintiffs disagree
2    with Howmedica's characterization of Mr. Harrison's activity level
3    during physical therapy as "high[.]" PSSOF (doc. 68) at 1, ¶ 28.
4    They disagree even though one of the excerpts from Dr. Camarata's
5    deposition to which plaintiffs cite supports Howmedica's view.  Dr.
6    Camarata testified, "[T]he reality is he was doing too much."  Mot.
7    to Amend and Notice of Erratum (doc. 58), exh. A thereto (Price
8    Dep'n) at 38:3.  Plaintiffs cite to another part of Dr. Camarata's
9    deposition where he testified, after reviewing the notes from Mr.
10   Harrison's physical therapy, that "for the most part, [it was] very
11   standard recovery in therapy, would have been exactly what [he]
12   expected."  Id.  at 116:11-13.

13        Following the weekend of November 15 and 16, 2003, "during
14   which Mr. Harrison participated in several activities including
15   golf, horseback riding and extensive walking, [he] saw Dr. Camarata
16   on November 18, 2003."  DSOF (doc. 44) at 5, ¶ 29; see also PSSOF
17   at 1.  "Dr. Camarata's notes from that visit indicate that Mr.
18   Harrison's fracture had in fact *not unionized* and the [LGN] had
19   broken."  Id. (citation omitted); see also PSSOF at 1.  "Attempts
20   at conservative treatment with a bone stimulator were abandoned due
21   to Mr. Harrison's pain and a new device was implanted . . . on
22   November 25, 2003."  Id. at 6, ¶ 31 (citation omitted); see also
23   PSSOF at 1.  As a result of the failed LGN, Mr. Harrison claims
24   that he has sustained "pain and permanent injury resulting in a
25   limp[.]" Amended Co. (doc. 14) at 6, ¶ 43.

26                          ***Discussion***
27   ***I.  Subject Matter Jurisdiction***
28        The parties did not challenge this court's subject matter

1   jurisdiction, which purports to be based upon diversity of

2   citizenship pursuant to 28 U.S.C. § 1332.  See Notice of Removal

3   (doc. 1).  Nonetheless, because federal courts have limited

4   jurisdiction, this court has "an independent obligation to

5   determine whether subject-matter jurisdiction exists, even in the

6   absence of a challenge from any party."  Arbaugh v. Y & H Corp.,

7   126 S.Ct. 1235, 1244 (2006) (citation omitted).  This obligation is

8   particularly compelling where, as here, subject matter jurisdiction

9   is not evident on the face of the removal petition or, for that

10  matter, on the face of the complaint.  As this court explained in

11  ordering additional briefing on the jurisdiction issue, the notice

12  of removal was facially defective in that there were no allegations

13  of plaintiffs' citizenship – only their residency.  See Doc. 69 at

14  2.

15      On several occasions this court has set forth "the simple

16  allegations needed to establish a natural person's state of

17  citizenship[] under § 1332(a)(1)[.]" Lacombe v. Bullhead City

18  Hospital Corp., 2007 WL 2702005, at *3 (D.Ariz. 2007) (internal

19  quotation marks and citations omitted).  In particular:

> To be a citizen of a state, a natural person
> must first be a citizen of the United States. . . .
> The natural person's state citizenship is then
> determined by her state of domicile, not her
> state of residence. *A person's domicile* is her
> *permanent home*, where she resides with the *intention
> to remain or* to which she *intends to return*. . . .
> A person residing in a given state is not necessarily
> domiciled there, and thus is not necessarily a
> citizen of that state.

26  Id. (internal quotation marks and citations omitted) (emphasis

27  added).

28      Howmedica has now amended its Notice of Removal to include

- 6 -

1  citizenship allegations in accordance with the foregoing
2  definition.  Based, *inter alia*, upon the deposition testimony of
3  plaintiff Edward Harrison, which establishes that plaintiffs live
4  part of the year in Phoenix, Arizona and part of the year in
5  Flagstaff, Arizona, Howmedica asserts that plaintiffs are domiciled
6  in Arizona and thus, in turn, Arizona citizens.  Although not
7  mentioned in the Amended Notice of Removal, Howmedica also notes
8  that Mr. Harrison returned to Arizona and continued medical
9  treatment and therapy here, after his injury in Montana.  This,
10  Howmedica contends, is further indicia that his domicile is
11  Arizona.

12      A Notice of Removal "can be amended after the 30 day period
13  allowed to file [such a] notice 'to add allegations . . . to
14  clarify defective allegations of jurisdiction previously made.'"
15  Sullivan v. BNSF Railway Company, 447 F.Supp.2d 1092, 1099 (D.Ariz.
16  2006) (quoting Barrow Dev. Co. v. Fulton Ins. Co., 418 F.2d 316,
17  317 (9th Cir. 1969)).  As noted, Howmedica has timely amended its
18  Notice of Removal to cure the formal errors of pleading citizenship
19  with respect to  plaintiffs.  See Jenkins v. Commonwealth Land
20  Title Ins. Co., 95 F.3d 791, 794 (9th Cir. 1996) ("Whatever formal
21  defect existed by virtue of Commonwealth statement in its notice of
22  removal that [plaintiff] is a "resident of Hawai'i rather than a
23  citizen was . . . cured by the amendment [of the notice of
24  removal][.]")

25      Based upon the Amended Notice of Removal, it is now clear that
26  there is complete diversity of citizenship between plaintiffs,

27
28

Arizona citizens, and defendant Howmedica,[4] which is a citizen of New Jersey, its place of incorporation and its principal place of business.  See 28 U.S.C. § 1332(c)(1) (A corporation is deemed to be a citizen of both the State in which it is incorporated "and of the State where it has its principal place of business[.]")   That does not end the court's inquiry into subject matter jurisdiction, however.

One other aspect of diversity jurisdiction is problematic here -- the presence of the fictitious defendants Black Corporations I - X, and White Partnerships I-X.  See Amended Co. (doc. 14) at 1-2, ¶ 5.  "This Circuit has long rejected naming 'Doe' defendants in diversity actions, such as this, on the grounds that complete diversity cannot exist if the identity and citizenship of some defendants (i.e. the "Does') are unknown."  Lacombe, 2007 WL 2702005, at *4 (internal quotation marks and citations omitted); see also Richmond v. Smith, 127 F.R.D. 178, 179 (D.Nev. 1989) (same) (citing cases).  "By the same token though, the Ninth Circuit has [long] held that where identity is unknown prior to the filing of a complaint, the plaintiff should be given an opportunity through discovery to identify the unknown defendant, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds."  Woodbeck v. U.S., 2008 WL 312104, at *3 (D.Ariz. 2008) (internal quotation marks and citation omitted).

In the present case, the parties undertook extensive discovery over the course of nearly six months.  Despite having had ample

---

[4]    The claims against the other named defendant entities were dismissed with prejudice.  See Doc. 13 at 1-2.

1   opportunity to ascertain the identity of these fictitious entities,
2   and move to amend their complaint accordingly, plaintiffs did not
3   do that.  Therefore, the court will *sua sponte* dismiss the claims
4   against the Black Corporations I-X and White Partnerships I-X.  It
5   is "appropriate" to *sua sponte* dismiss claims against unknown
6   defendants is "[w]hen a plaintiff fails to use the discovery
7   process to identify an 'unknown' defendant[.]" <u>Corrigan v. Unknown</u>
8   <u>King County Deputy #1</u>, 2006 WL 3249135, at *2 (W.D.Wash. 2006)
9   (citation omitted).  Dismissal under those circumstances is proper
10  because, "[a]s one court has observed 'a district court otherwise
11  prepared to act on dispositive motions is not obligated to 'wait
12  indefinitely for [the plaintiff] to take steps to identify and
13  serve . . . unknown defendants.'" <u>Id.</u> (quoting <u>Figuerora v. Rivera</u>,
14  147 F.3d 77, 82 (1st Cir. 1998)).

15      Given Howmedica's Amended Notice of Removal and the court's
16  *sua sponte* dismissal of the fictitious defendants, there is now a
17  complete and affirmative showing that diversity jurisdiction exists
18  here.  Having satisfied itself that it has subject matter
19  jurisdiction, the court will address to the merits of Howmedica's
20  motions.

21      Because discovery is complete, plaintiffs have had ample
22  opportunity to ascertain the identity of these fictitious entities,
23  and move to amend their complaint accordingly.  Plaintiffs have not
24  done that, however.

25  ***II.  Summary Adjudication***

26      Defendant is seeking summary adjudication because plaintiffs
27  did not timely respond to their initial motions to strike and for
28  summary judgment.  Although defendant agreed to an extension of

- 9 -

1   time, until June 8, 2007, by which plaintiffs were to file their

2   response to those defense motions, Mot. for Summary Adjudication

3   (doc. 52), exh. B thereto at 1, plaintiffs did not file their

4   responses until June 13, 2007.  Among other things, defendant

5   contends that this late filing could have been avoided had

6   plaintiffs requested an expedited transcript of defense expert Dr.

7   Gary Marrone.  Id. at 2.  Defendant also takes issue with

8   plaintiffs' supposed "eleventh hour" request for an additional

9   extension of time until June 12, 2007.  See id. at 3.  For these

10  reasons, among others, in accordance with LRCiv 7.2(i)[5] defendant

11  asserts that the court should deem plaintiffs' untimely responses

12  as consent to the granting of motions to strike and for summary

13  judgment.

14      Plaintiffs strenuously oppose this motion, asserting that

15  defendant has "sought to impose an unrealistic time limit" on their

16  response to defendant's motions.  Resp. (doc. 57 and 64[6]) at 1.

17      This motion need not detain the court for long.  As more fully

18  explained in Proctor v. Safeway Food & Drug, Inc., 2007 WL 2892944,

19  at *5 (D.Ariz. 2007), although the court realizes that LRCiv 7.2

20  "permits summarily granting motions for non-compliance" with that

21  Rule, it declines to do so here.  Although there may be

22  circumstances where noncompliance with that Local Rule provides a

23  sufficient basis for granting a motion, this is not such a case.

24  _____

25      [5]    Courts within this district, including this one, have interpreted that
    rule to mean that if a response is not timely filed pursuant to LRCiv 7.2, that
26  non-compliance may be deemed a consent to the granting of the motion.  See, e.g.
    Inter-Tel (Delaware), Inc. v. Fulton Communications, 2007 WL 1725349, at *1
27  (D.Ariz. 2007) (Broomfield, J.); and Higby v. Newby, 2006 WL 359862, at *4 (D.Ariz.
    2006) (McNamee, C.J.).

28      [6]    Document 64 is duplicative of document 57.

1  Relatively speaking, the delay here was insignificant.  Not only

2  that, resolving these motions on the merits is in keeping with the

3  "public policy favoring disposition of cases on their merits[.]"

4  See In re Phenylpropanolamine (PPA) Products, 460 F.3d 1217, 1129

5  (9th Cir. 2006) (citation omitted).  Furthermore, that policy seems

6  especially strong here where it is readily apparent that the

7  parties have expended a fair amount of resources in terms of

8  discovery in terms of taking depositions and compiling expert

9  reports, not to mention the fairly extensive briefing on these

10  motions.   Thus, the court denies defendant's motion for summary

11  adjudication and instead opts to resolve these motions on the

12  merits.

13  ***III.  Motion to Exclude***

14      As will be more fully discussed below, Howmedica contends that

15  the court should preclude Dr. Anderson from testifying that the LGN

16  is defective.  Clearly if Howmedica prevails on that motion, it

17  will significantly impact Howmedica's summary judgment motion in

18  terms of the admissible proof before the court.  Thus, the court

19  will address Howmedica's motion to exclude first.

20      ***A.  Statement of Controverting Facts***

21      Before examining the merits of Howmedica's motion to exclude,

22  there is one preliminary issue -- whether to strike plaintiffs'

23  statement of controverting facts submitted in response to that

24  motion to exclude.  This motion to strike was precipitated at least

25  in part by the manner in which Howmedica presented its motions to

26  exclude and for summary judgment.

27      In support of both its motion to exclude and its summary

28  judgment motion, Howmedica filed a "Statement of Facts" containing

1  55 paragraphs and 16 exhibits, totaling approximately 150 pages.

2  Howmedica expressly states that it is submitting that Statement

3  pursuant to LRCiv 56.1(a), which governs summary judgment motions

4  only.  In any event, plaintiffs responded by filing, *inter alia*, a

5  separate document entitled "Plaintiffs' Controverting Statement of

6  Facts in Response to Defendant's Motion to Exclude Expert

7  Opinion[,]" which includes 12 exhibits, totaling approximately 98

8  pages.  <u>See</u> Doc. 56.  Howmedica, in turn, filed a "motion to

9  strike" that statement of controverting facts.  <u>See</u> Doc. 60 at 1.

10       These "statements of fact," controverting or otherwise, are

11  not the proper means by which to present evidence in connection

12  with a motion to exclude.  LRCiv 56.1(a) is explicit; such

13  statements are to be submitted in connection with "motions for

14  summary judgment[.]"  LRCiv. 56.1.  It necessarily follows then,

15  that a motion to strike, such as Howmedica's, is not the proper

16  vehicle by which to challenge plaintiffs' opposition to the

17  exclusion motion.  Accordingly, the court denies Howmedica's motion

18  to strike plaintiffs' statement of controverting facts submitted in

19  response to Howmedica's motion to exclude.  Instead, the court will

20  consider the record before it on this motion to exclude within the

21  context of the governing legal standards outlined below.

22       **<u>B.  Robert N. Anderson, Ph.D.</u>**

23       Basically, Robert N. Anderson, Ph.D., plaintiffs'

24  metallurgist, opines that the LGN has a design defect because it is

25  "susceptible to fatigue failure."  PSOF (doc. 56), exh. C thereto

26  at 1.[7]  Dr. Anderson further opines that one of three different

27  ───────────────

28       [7]    For ease of reference, the court took the liberty of numbering the
pages in this exhibit.

- 12 -

surface treatments could have been employed on the LGN, which would have "reduce[d] [its] susceptibility to fatigue failure."  _Id._

Howmedica is moving to exclude Dr. Anderson's opinions on two separate bases.  First, it contends that he is not qualified. Second, even if he is qualified, Howmedica maintains that Dr. Anderson's "opinions should be excluded for lack of sufficient support."  Mot. (doc. 48) at 6.

Howmedica's first challenge to Dr. Anderson's qualifications is his purported lack of "real world experience[.]"  _See_ _id._ at 6 (citation omitted).  Second, Howmedica challenges Dr. Anderson's qualifications because supposedly "since at least . . . 2000, this is the only case in which [he] has tried to offer opinions about a medical device that he claims is defectively designed or manufactured."  _Id._ (citation omitted).  With no explanation, Howmedica further declares that because those are matters "outside [his] area of expertise[,]" Dr. Anderson is not qualified to opine as to whether the LGN "is defective, including whether [it] performed as intended[.]"  _Id._

Plaintiffs vigorously dispute Howmedica's assertion that Dr. Anderson is not qualified, challenging both the factual predicate and the legal basis for that assertion.  Reciting Dr. Anderson's educational background, plaintiffs' initial response is: "There is no question [that] [he] is qualified to offer opinions in this case."  Resp. (doc. 55) at 3.  Without citing to any case law, plaintiffs dispute Howmedica's suggestion that "real world experience" is essential to a finding that Dr. Anderson is qualified within the meaning of Rule 702.  Also without any legal support, plaintiffs similarly contest Howmedica's suggestion that

1  prior litigation experience is a necessary precursor to finding an

2  expert witness qualified.

3      Howmedica did not directly respond to either of these

4  arguments.  Rather it responded more generally, stating that

5  because Dr. Anderson is not a "biomechanics expert[,] . . . [h]e

6  cannot opine about the fatigue fracture and how the biomechanics of

7  the hip can lead to fatigue of the implant."  Reply (doc. 59) at 2.

8  Howmedica then reiterated its belief that "Dr. Anderson is "going

9  beyond his expertise in metallurgy . . . [in] trying to offer

10 opinions about the design of the [LGN][,]" although again it does

11 not explain why.  Id.

12     As to the asserted factual discrepancies, the court has

13 carefully reviewed the cited excerpts from Dr. Anderson's

14 deposition and finds that the parties took some liberties in

15 construing his testimony.  The court will overlook these differing

16 characterizations at this juncture because these claimed facts are

17 not dispositive of the qualification issue.  Instead, the court

18 will focus primarily on the legal support or, more accurately, the

19 lack thereof for Howmedica's claim that Dr. Anderson is not

20 qualified.

21     **_1. Qualifications_**

22     In the seminal case of <u>Daubert v. Merrell Dow Pharmaceuticals,</u>

23 <u>Inc.</u> 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the

24 Supreme Court cast trial judges in the role of "gatekeeper[s] in

25 determining whether to admit or exclude expert evidence[]" in

26 accordance with Rule 702.  <u>See Dukes v. Wal-Mart, Inc.</u>, 509 F.3d

27 1168, 1179 (9th Cir. 2007) (internal quotation marks omitted).  The

28 <u>Daubert</u> Court "held that Federal Rule of Evidence 702 commands the

primary focus for courts evaluating the admissibility of expert testimony." <u>Cooper v. Brown</u>, 510 F.3d 870, 942 (9th Cir. 2007). That Rule provides in part that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact issue," an expert "may testify thereto." Fed. R. Evid. 702. Before a witness may come "before the jury cloaked with the mantle of an expert[]" under Rule 702, the Ninth Circuit has cautioned that "care must be taken to assure that a proffered witness truly qualifies as an expert, and that such testimony meets the requirements of [that] Rule[.]" <u>Jinro America Inc. v. Secure Investments, Inc.</u>, 266 F.3d 993, 1004 (9th Cir. 2001).   Thus, as an threshold matter, in accordance with Rule 702 the court must determine whether the proffered witness is "qualified as an expert by knowledge, skill, experience, training, or education[.]" Fed. R. Evid. 702; <u>see also</u> <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 43 F.3d 1311, 1315 (9th Cir. 1995) ("<u>Daubert II</u>")(whether proffered expert testimony is admissible "only arises if it is first established that the individual[] whose testimony is being proffered [is] [an] expert[] in a particular . . . field[]").

　　　"To satisfy this standard, it is essential that 'the proposed witness's qualifying training or experience, and resultant specialized knowledge, are sufficiently related to the issues and evidence before the trier of fact [such] that the witness's proposed testimony will be of assistance to the trier of fact.'" <u>In re Apollo Group Inc. Securities Litigation</u>, 2007 WL 3342704, at *2 (D.Ariz. 2007) (quoting 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, ¶ 702[04][1][b], at 702-45 (other citation omitted)). "Rule 702 contemplates a *broad conception* of

1  expert qualifications[,]" as is evidenced by the advisory committee

2  notes thereto "emphasiz[ing] that Rule 702 is broadly phrased and

3  intended to embrace more than a narrow definition of qualified

4  expert." <u>Hangarter v. Provident Life & Accident Ins. Co.</u>, 373 F.3d

5  998, 1015 (9th Cir. 2004) (internal quotation marks and citations

6  omitted) (emphasis added by <u>Hangarter</u> Court).   Accordingly, "[t]he

7  threshold for qualification is low, a minimal foundation of

8  knowledge, skill, and experience suffices." <u>Heston v. City of</u>

9  <u>Salinas</u>, 2007 WL 4754777, at *2 (N.D.Cal. 2007) (citing, *inter*

10 *alia*, <u>Hangarter</u>, 373 F.3d at 1015-16).   The burden is on the

11 proponent of the expert to establish, by "a preponderance of the

12 evidence . . . that the expert is qualified to render the

13 opinion[.]" <u>Id.</u> (citing <u>Daubert</u>,509 U.S. at 588-90).   Whether a

14 proffered expert witness has sufficient qualifications is subject

15 to review under the relatively lenient abuse of discretion

16 standard.   <u>See Cooper</u>, 510 F.3d at 876 (citation omitted).   The

17 parties' respective arguments as to whether Dr. Anderson qualifies

18 as an expert under Rule 702 must be analyzed against this legal

19 backdrop.

20     Howmedica baldly asserts that Dr. Anderson has no "real world

21 experience designing, manufacturing or testing medical devices,

22 particularly implantable medical devices[]" such as the LGN.   Mot.

23 (doc. 48) at 5-6.   Therefore, he cannot qualify as an expert under

24 Rule 702.   This argument is without merit.

25     Assuming *arguendo* that Dr. Anderson lacks "real world

26

27

28

1   experience" (however defined[8]), that is an insufficient basis for
2   concluding that he is not qualified under Rule 702.  As set forth
3   earlier, that Rule expressly recognizes five separate grounds for
4   qualifying an expert: "knowledge, skill, experience, training, *or*
5   education."  Fed. R. Evid. 702 (emphasis added).  This "disjunctive
6   conjunction," which presumably "the drafters of the rule chose
7   deliberately suggests that an expert may be qualified on any of the
8   five bases listed."  <u>Lavespere v. Niagara Mach. & Tool Works, Inc.</u>,
9   910 F.3d 167, 176 (5th Cir. 1990) (footnote omitted), <u>abrogated on</u>
10  <u>other grounds</u>, <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069 (5th Cir.
11  1996); <u>Kopf v. Skyrm</u>, 993 F.2d 374, 377 (4th Cir. 1993) (same).
12  Thus, "[u]nder Rule 702, a witness may be qualified as an expert by
13  virtue of any one such factor, or upon a combination of any of the
14  factors listed in the rule."  <u>Pacific Gas and Electric Co. v.</u>
15  <u>Howard P. Foley Co., Inc.</u>, 1993 WL 299219, at *5 (N.D.Cal. 1993)
16  (citing, *inter alia*, <u>Exum v. General Electric Co.</u>, 819 F.3d 1158,
17  1163 (D.C.Cir. 1987)).  Thus, although Dr. Anderson *may* not have
18  any "real world experience," that does not mean that he cannot
19  qualify as an expert pursuant to Rule 702 because, as set forth
20  below, undisputably he can qualify on other grounds set forth in
21  that Rule.
22

---

23  <sup>8</sup>      According to Howmedica, Dr. Anderson has "no real world experience designing . . . medical devices[.]" Mot. (doc. 48) at 6 (citation omitted).  That
24  is a bit of an overstatement (and representative of the liberties both Howmedica and plaintiffs took with the record), however, given his deposition testimony.
25  When specifically asked about "design solution[s]" which he devised, Dr. Anderson testified that he advised "them" (presumably a manufacturer) to "change the
26  composition of the laser lens[]" on a device which cleans plaque from arteries so that that laser would not "de-focus" during the process.  PSOF (doc. 56), exh. A
27  (Deposition of Robert N. Anderson (March 12, 2007)) thereto at 34:9-10.  Conceding that "[his] design was very limited[,]" nonetheless, it seems to fall into the
28  category of the type of "real world experience" which Howmedica believes Dr. Anderson lacks.  <u>See</u> <u>id.</u> at 34:3.

1    According to his curriculum *vitae*, in addition to his several
2  chemistry related degrees, Dr. Anderson has a Ph.D. in metallurgy
3  from Stanford University.  DSOF (doc. 44), exh. A thereto at 1.  He
4  is also a registered, licensed metallurgical engineer in the State
5  of California.  Id.  Formerly Dr. Anderson was the Chairperson of
6  the Department of Materials Engineering at San Jose State
7  University, and a full professor there.  Id.  Additionally, Dr.
8  Anderson has several professional affiliations which seem
9  particularly significant in terms of this lawsuit.  He is a member
10 of the American Academy of Forensic Sciences and past chairperson
11 of the Engineering Sciences Section; he is also a Fellow and Past
12 President of the National Academy of Forensic Engineers.  Id.  In
13 light of the foregoing, the court finds that Dr. Anderson has
14 sufficient knowledge, training and education to qualify him as an
15 expert in metallurgy under Rule 702, notwithstanding his supposed
16 lack of "real world experience."
17    Similarly unavailing is Howmedica's contention that Dr.
18 Anderson does not qualify as an expert because of his purported
19 lack of recent experience in cases involving medical devices which
20 allegedly were defectively designed or manufactured.  The court is
21 not aware of any requirement, and Howmedica cites to none,
22 correlating a witness's expert status with the number of times that
23 witness has previously testified or otherwise participated in any
24 aspect of the legal process.  The court declines to impose such a
25 requirement.  Dr. Anderson's alleged lack of participation in
26 similar litigation in recent years carries no weight with the court
27 in determining whether he qualifies as an expert pursuant to Rule
28 702.

1    Equally unpersuasive is Howmedica's undeveloped argument that
2    Dr. Anderson is not qualified to opine that the LGN is defective
3    because it is beyond his area of expertise.  In making this
4    argument, Howmedica misconstrues the nature of Dr. Anderson's
5    testimony.  Howmedica states that he will be opining as to "how the
6    *biomechanics of the hip* can lead to fatigue of the [LGN]."  Reply
7    (doc. 59) at 2 (emphasis added).  Even a cursory review of his
8    first report shows, however, that Dr. Anderson does not intend to
9    testify as to biomechanics.  In that report, Dr. Anderson opines
10   that the LGN is defective because it "is manufactured from an ultra
11   high strength stainless steel alloy[,]" which "tend[s] to behave in
12   a brittle manner and [is] susceptible to fatigue failure."  PSOF
13   (doc. 56), exh. C thereto at 1.  Employing one of three different
14   types of surface treatments to the surface of the LGN would, in Dr.
15   Anderson's opinion, have made the LGN less susceptible to fatigue
16   failure.  This testimony falls squarely within the province of Dr.
17   Anderson's expertise in metallurgy.

18   Dr. Anderson's education, training, and experience, as
19   detailed in his curriculum *vitae*, meet the liberal standards for
20   qualification as an expert witness in metallurgy under Fed. R.
21   Evid. 702.  Not only that, even Howmedica admits that as a
22   "qualified . . . metallurgist," Dr. Anderson "can testify regarding
23   the fatigue fracture as it relates to metal[.]" Reply (doc. 59) at
24   3.  Given the nature of Dr. Anderson's proffered testimony, as just
25   summarized, Howmedica's contention that he must qualify as an
26   expert in biomechanics is without merit.  To the extent Howmedica's
27   argument can be construed as asserting that Dr. Anderson lacks a
28   particularized expertise, *i.e.*, biomechanics, that goes to the

1  weight of his testimony, and not to whether he qualifies as an

2  expert in the first instance.  See United States v. Garcia, 7 F.3d

3  885, 890 (9th Cir. 1993) (citation and footnote omitted).  For the

4  reasons outlined above, the court denies Howmedica's motion to

5  exclude the testimony of Dr. Anderson because he does not qualify

6  as an expert under Rule 702.

### 2.  Proffered Testimony

8      Once a court makes the "preliminary" determination under Fed.

9  R. Evid. 104(a)[9] that a witness qualifies as an expert, the focus

10 shifts to that witness's proffered testimony.  As interpreted by

11 the Daubert Court, there is a two-part inquiry under Rule 702 for

12 determining the admissibility of proffered expert opinion testimony

13 such as Dr. Anderson's.  Expert testimony must be "not only

14 relevant, but reliable."  Daubert, 509 U.S. at 589, 113 S.Ct. 2786.

15 "The test for reliability . . . 'is not the correctness of the

16 expert's conclusions, but the soundness of his methodology.'"

17 Stilwell, 482 F.3d at 1192 (quoting Daubert II, 43 F.3d at 1318).

18 To determine whether Dr. Anderson's testimony satisfies "the twin

19 concerns of reliability and helpfulness[]" which Rule 702 embodies

20 and whether it otherwise comports with Daubert and its progeny, a

21 fairly detailed review of his testimony is necessary.  See id. at

22 1192 (internal quotation marks and citations omitted).

23     Dr. Anderson prepared two reports in connection with this

24 litigation.  In his first report, consisting of one page, Dr.

25 Anderson observes preliminarily that the LGN "is manufactured from

26

---

27      [9]     That Rule expressly provides, inter alia, that "[p]reliminary questions
concerning the qualification of a person to be a witness, . . . shall be determined
28 by the court[.]" Fed. R. Evid. 104(a).

1  an ultra high strength stainless steel alloy[.]"  PSOF (doc. 56),

2  exh. C thereto at 1.  Dr. Anderson declares that such "metals tend

3  to behave in a brittle manner and are susceptible to fatigue

4  failure."  Id.  Dr. Anderson also recites his "understanding that

5  the [LGN] that was surgically implanted in Mr. Harrison was in

6  place for only approximately 14 weeks before the failure was

7  detected."  Id.

8      Noting that the RJ Lee*Group* report[10] "indicate[d] that the

9  [LGN] failures started as a fatigue failure that progressed until

10  the remaining fracture surface failed in overload[,]" Dr. Anderson

11  confirms that this "failure also was observed in [his] inspection."

12  Id.  The foregoing "indicates" to Dr. Anderson "that the [LGN] [is]

13  improperly designed."  Id.  Dr. Anderson identified two ways in

14  which he believes the LGN is improperly designed: (1)"[t]he

15  situation stresses are too high for [its] dimensions[;]" and (2)

16  the surface of the LGN was  not "finished to reduce susceptibility

17  to fatigue failure."  Id.  Dr. Anderson did not elaborate with

18  respect to "situation stresses."

19      In contrast, Dr. Anderson did explain why he believes the lack

20  of surface finishes constitute a design defect.  He stated that

21  "examination" shows that the LGN "ha[d] been polished, but [it]

22  ha[d] not been finished to reduce susceptibility to fatigue

23  fracture."  Id.  Further, Dr. Anderson opines that "[t]his is

24

25      [10]    Prior to the commencement of this action, Mr. Harrison's daughter sent
    the LGN to RJ Lee*Group*, self-described "Materials Characterization Specialists[,]"
26  (doc. 56), exh. E thereto (Lee*Group* Report) at 1, "for materials failure
    analysis[.]" DSOF (doc. 44) at 8, ¶ 37; see also PSSOF at 2.  "That analysis, . .
27  . , was directed at determining the failure mode of the [LGN] and if material
    defects could be detected that would have limited the service life of [its]
28  components." Id. (internal quotation marks and citation omitted); see also PSSOF
    at 2.

1   normally done by putting compressive forces into the surfaces[,]"
2   but he does not explain in his report how this would be
3   accomplished.  See id.  Nor does Dr. Anderson explain how such
4   forces would have changed the result, if at all, in terms of the
5   LGN which was implanted in Mr. Harrison's femur.  Dr. Anderson does
6   not, for example, opine that if the LGN had been subjected to these
7   "compressive forces," it would not have failed at 14 weeks, but
8   instead would have remained intact for some other finite period of
9   time beyond 14 weeks.  In any event, knowing that at approximately
10  14 weeks it was detected that Mr. Harrison's LGN failed, and based
11  on the "analysis" outlined above, Dr. Anderson "believes that the
12  [LGN] w[as] defective and not suitable for its intended purpose."
13  Id.

14      Observing that there is agreement that the LGN "fail[ed] . . .
15  due to fatigue," in his second report Dr. Anderson attempts to
16  refute certain aspects of the report prepared by Howmedica's
17  retained metallurgists from Packer Engineering ("PE").  Id. at 2.
18  Questioning Howmedica's view that the LGN failed because Mr.
19  Harrison was "very active[]" and that the LGN "is only designed for
20  temporary structural stability until the fracture heals[,]" Dr.
21  Anderson asserts that "failure in 3.5 months is unacceptably
22  temporary in a 145 pound man with limited mobility."  Id. at 3, ¶
23  5.  From Dr. Anderson's perspective, Howmedica "should have been
24  designed and manufactured a more substantial device that would
25  survive for more than 3.5 months."  Id.  In this regard, Dr.
26  Anderson again faults the LGN's lack of a surface finish "to
27  increase its resistance to fatigue failure."  Id. at 3, ¶ 7.
28  Responding to the PE observations that "there is no industry

standard requiring such additional surface treatment[,]" and that "the [LGN] will still eventually fracture[,]" Dr. Anderson states, somewhat ambivalently, that regardless of the foregoing, "it would seem that a satisfactory design would ensure that the [LGN] lasted longer than 3.5 months." Id. (internal quotation marks omitted).

Interestingly, during his deposition Dr. Anderson declined to give a specific time frame for the LGN "to have lasted" so that he would not deem it "defective[.]" DSOF (doc. 44), exh. B thereto (Deposition of Robert N. Anderson (March 12, 2007)) at 79. When pressed as to how long the LGN should last so it would not, in Dr. Anderson's opinion, be defective, he replied, "it's a sliding scale[,]" but "[f]ourteen weeks seemed a little short." Id. at 79:15 and 79:18-19. Further, Dr. Anderson admitted that he does not "know what the actual number is[;]" nor has he "tried to look at what number will be susceptible." Id. at 79:19-21. When asked his reason for stating that 14 weeks "seem[s] short[,]" his response was circular: "Based upon the fact that it's a short time." Id. at 79:22; and 79:25.

Disputing the "comment" by Howmedica's metallurgist that "[t]he fact that the [LGN] fractured is not a scientific basis for determining the design was improper[,]" Dr. Anderson succinctly concluded his second report in this way. The fact that the LGN fractured, "add[ed] [to the fact] that it failed in three and a half months in a 145 pound man with limited mobility," means that "you can state firmly that the design was improper." Id. (internal quotation marks omitted).

During his deposition, Dr. Anderson testified that "there are a number of . . . , inexpensive, well established techniques that

could change the surface [of the LGN] to give [it] resistance to
fatigue."  PSOF (doc. 56), exh. A thereto (Dep'n of Robert N.
Anderson (March 12, 2007)) at 68:17-19.  First, Dr. Anderson opines
that the LGN could have been subjected to ion implementation, a
technique not mentioned in either of his reports.  See DSOF (doc.
44), exh. B thereto at 87:24-88:6.  Another possible surface
treatment technique, also not mentioned in either of his reports,
would have been the use of "a plating or a coating[,]" such as
"cold plating[,]" or "titanium or a cobalt plating."  Id. at 92:15
- 93:7.  Dr. Anderson's third suggested technique (mentioned in
passing in his first report), is the use of "compressive
processes[,]" sometimes  referred to as "peening[.]" Id. 96:18-
97:10.  The use of any of these three techniques or processes, from
Dr. Anderson's point of view, would result in the LGN being, as he
described it, "non-defective[]" in that it would have "[h]igh
resistance to fatigue failure[.]" Id. at 87:5-6.  But again, Dr.
Anderson did not quantify that resistance in any way.

     In short, if allowed to testify, Dr. Anderson will opine that
the LGN is defective because "[one] could increase [its] . . .
fatigue resistance easily, . . . by [using one of these three types
of] surface changes, and none of that [was] done." PSOF (doc. 56),
exh. A (Anderson Dep'n) thereto at 68:3-4.  Continuing, Dr.
Anderson testified: "I think it's defective that they can spend 25
years with a product and not spend a little bit of research and
effort to try and increase the resistance to fatigue."  Id. at
68:21-24.

     Shortly thereafter, when explicitly asked "what is your defect
criteria that you are employing[,]" Dr. Anderson reiterated,

"Susceptible to fatigue, which could have been ameliorated."  DSOF (doc. 44), exh. B thereto at 70:9-12.  Following up, Dr. Anderson was asked: "I take it then that, and you almost come right out and say that earlier in your report, the fact that the [LGN] broke is essentially what you rely on to conclude that it therefore must have been defective, true?"  <u>Id.</u> at 70:13-17.  Dr. Anderson agreed that "in part" he relied upon "the fact that the [LGN] broke . . . to conclude that it . . . must have been defective[.]"  <u>Id.</u> at 70:14-18.  Dr. Anderson added that the manufacturer's "recognition of a defect[]" in that "the manufacturer itself says this part's going to fail[,]" and then "not trying to ameliorate it makes the product defective."  <u>Id.</u> at 70:23-25.

### *a.  Reliability*

Putting aside for the moment the issue of whether Dr. Anderson's testimony as just recounted, is relevant, still, it is not admissible under <u>Daubert</u> and its progeny unless is "satisf[ies] a second hurdle, reliability."  <u>See</u> <u>Cooper</u>, 510 F.3d at 942. Assuring that an "'expert's opinion [has] a reliable basis in the knowledge and experience of his discipline[,]'" is critical because "[a]n expert witness - unlike other witnesses - 'is permitted wide latitude to offer opinions, including those that are not based on first hand knowledge or observation[.]'" <u>Jinro America</u>, 266 F.3d at 1004 (quoting <u>Daubert I</u>, 509 U.S. at 592, 113 S.Ct. 2787) (other citation omitted).  This "preliminary" reliability determination requires a trial court to "act as a gatekeeper to exclude junk science that does not meet Rule 702's reliability standards[.]" <u>Cooper</u>, 510 F.3d at 942 (internal quotation marks and citation omitted).

1    "Rule 702 demands that expert testimony relate to scientific,

2  technical or other specialized knowledge, which does not include

3  unsubstantiated speculation and subjective beliefs."  Id. (internal

4  quotation marks and citation omitted).  As the Daubert Court

5  explained:

6           [I]n order to qualify as scientific knowledge,
             an inference or assertion must be derived by
7           the scientific method.  Proposed testimony must
             be supported by appropriate validation - i.e.,
8           good grounds, based on what is known.  In short,
             the requirement that an expert's testimony pertain to
9           scientific knowledge establishes a standard
             of evidentiary reliability.

10

11  Daubert, 509 U.S. at 590, 113 S.Ct. 2786 (internal quotation marks

12  omitted).  Thus, "something doesn't become 'scientific knowledge'

13  just because it's uttered by a scientist; nor can an expert's self-

14  serving assertion that his conclusions were 'derived by the

15  scientific method' be deemed conclusive[.]" Daubert II, 43 F.3d at

16  1315-1316.  After Daubert, the court's "task" is to "analyze not

17  what the experts say, but what basis they have for saying it."  Id.

18  at 1316. When the court does that here, as discussed below, it is

19  left with the firm conviction that Dr. Anderson's opinion testimony

20  does not carry sufficient indicia of reliability to satisfy Rule

21  702 as explicated in Daubert and its progeny.

22     In assessing the reliability of scientific or other

23  specialized evidence such as engineering or metallurgy,[11] the

24  Daubert Court enumerated four "non-exclusive" factors: "(1) whether

25

26  ───────────────
         [11]    Although Daubert I "focused on scientific testimony[,]" subsequently,
27  in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d
    238 (1999), the Supreme Court "made clear that Daubert[I]'s principles apply to
    "technical and other specialized knowledge' as well." Jinro American, 266 F.3d at
28  1004 (quoting Kumho, 526 U.S. at 141, 147-49).

1   a scientific theory or technique can be (and has been) tested; (2)

2   whether the theory or technique has been subjected to peer review

3   and publication; (3) the known or potential rate of error and the

4   existence and maintenance of standards controlling the technique's

5   operation; and (4) whether the technique is generally accepted."

6   Id. at 942-943 (citing, *inter alia*, Daubert, 509 U.S. at 593-94,

7   113 S.Ct. 2786).   Emphasizing that this "list of factors [i]s meant

8   to be helpful, not definitive[,]" the Supreme Court has

9   acknowledged that "those factors do not all necessarily apply even

10  in every instance in which the reliability of scientific testimony

11  is challenged."   Kumho Tire, 526 U.S. at 151, 119 S.Ct. 1167.

12  Regardless of which factors a court focuses upon, however, at the

13  end of the day "[t]he goal is to make certain that an expert . . .

14  employs in the courtroom the same level of intellectual rigor that

15  characterizes the practice of an expert in the relevant field."

16  Cooper, 510 F.3d at 943 (internal quotation marks and citations

17  omitted).

18  . . .

19

20

21

22

23

24

25

26

27

28

### *i.  Testing*[12]

Howmedica objects to Dr. Anderson's testimony because he did not test the LGN itself.  Nor did Dr. Anderson test any of his proposed design alternatives, *i.e.* the surface treatment techniques.   The crux of Dr. Anderson's testimony is that the LGN has a design defect in that it would have had higher resistance to fatigue failure had it been subjected to one of three surface treatments which he suggested.  In light of that emphasis, the court will focus on the lack of  testing with respect to the proposed design alternatives.

Dr. Anderson unequivocally agreed during his deposition that he is "going to . . . call [the LGN] defective because of the lack of a surface treatment[.]" DSOF (doc. 44), exh. B thereto (Anderson Dep'n) at 89:23- 90:1.  One of Dr. Anderson's proposed surface treatment techniques is, as mentioned earlier, ion implementation. When asked whether he "ha[d] any testing of this [LGN] or a similar

---

[12]    When an expert has not done any "original research[]" and instead relies upon "derivative analytical work," the Ninth Circuit has observed that "it makes little sense to ask whether the technique employed can be (and has been) tested, . . . or what its known or potential rate of error might be[.]" Daubert II, 43 F.3d 1317 n.4.  Here, evidently Dr. Anderson has not conducted any original research in that his analysis appears to be based upon a review of two other reports prepared in connection with this lawsuit; a "product experience" report; and his visual examine of the LGN.  See PSOF (doc. 56), exh. C thereto at 1; see also id., exh. A thereto (Anderson Dep'n) at 23:23-29:22.  Therefore, at first glance the testing and rate of error factors do not seem to apply here.

    By the same token though, Dr. Anderson's work is not derivative, at least as the Ninth Circuit defines it. "Derivative analytical work," according to the  Ninth Circuit, is conducted by "examin[ing] the available literature and studies within [an expert's] . . . field and draw[ing] *different conclusions* than the scientists who performed the original work."   Daubert II, 43 F.3d at 1317 n.4 (emphasis added).   Dr. Anderson has "reviewed" five "peer-reviewed publications[,]" PSOF (doc. 56), exh. D thereto (Affidavit of Robert N. Anderson (June 7, 2007)) at ¶ 1; but there is no indication that he has drawn "different conclusions than the scientists who performed the original work."  See Daubert II, 43 F.3d at 1317 n.4. Thus, although Dr. Anderson's work is not original research, because it is not derivative, as the Ninth Circuit has used that term, recognizing the flexible nature of the Daubert inquiry, the court will consider the testing and rate of error factors in assessing the reliability of his testimony.

device . . . made up of this steel alloy, but bombarded with ions
that [he] believe[s] tells [him] would have made [the LGN]
stronger[,]" Dr. Anderson responded, "No."  Id., exh. B thereto at
91:4-8.  Similarly, Dr. Anderson was asked about testing with
respect to his suggestion of coating the LGN:

> Have you done any testing of this [LGN] as
> designed and as dimensioned and with the
> materials used, but coated with either some
> sort of chrome or titanium or cobalt, to determine
> how much longer, if at all, this [LGN], not some
> other metal, but this implantable medical device
> would have lasted?

95:19-24. Dr. Anderson candidly responded: "No, I think that's the
job of the manufacturer that wants to make a safe product."  Id.,
exh. B thereto at 95:25-96:1.

The burden is on plaintiffs, as the proponent of this
testimony, to demonstrate that Dr. Anderson's "opinion or theory is
reliable, which takes into consideration any testing that has been
done of the theory."  See Martinez v. Terex Corporation, 241 F.R.D.
631, 638 (D.Ariz. 2007).  Plaintiffs attempt to satisfy the testing
aspect of reliability by relying upon the affidavit of Dr.
Anderson, post-dating his deposition by roughly three months.[13]  In

---

[13]   Howmedica urges the court not to consider what it characterizes as
this "improper affidavit[.]"  See Reply (doc. 59) at 1.  The court should not
consider this affidavit because from Howmedica's point of view Dr. Anderson is
impermissibly "contradicting his prior [deposition] testimony[.]"  Id. at 6
(citation omitted).  Howmedica implies that Dr. Anderson's affidavit is a sham and
as such, the court must disregard it.
   As the court reads Dr. Anderson's affidavit, however, he is "elaborating
upon, explaining or clarifying prior testimony elicited by opposing counsel on
deposition[.]"  See Scamihorn v. General Truck Drivers, 282 F.3d 1078, 1085 n.7 (9th
Cir. 2002) (citation omitted).  At most, this affidavit is akin to those containing
"minor inconsistencies that result from an honest discrepancy, a mistake, or newly
discovered evidence," which the Ninth Circuit has held do not "afford [a] basis for
exclu[sion][.]"  See id. Consequently, despite Howmedica's protestations, the court
does not view Dr. Anderson's affidavit as a sham, and thus will not disregard it
on that basis.  As will be seen, however, the court does not give that affidavit
much credence due to the largely unsubstantiated nature of the averments therein.

1  that affidavit, Dr. Anderson avers generally:

2          The metallic surface strengthening techniques/
           processes which I opine would have increased
3          [LGN] surface strength so as to slow or
           prevent fatigue cracking and failure are tested
4          and peer-reviewed and accepted in the metallurgical
           community.
5

6  PSOF (doc. 56), exh. D thereto at ¶ 1.  That bald assertion,

7  without more, such as the nature of the testing, by whom and the

8  circumstances under which it was done, where and when the testing

9  was performed, and perhaps most significantly, the results yielded

10 by the testing of those "metallic surface strengthening

11 techniques/process[,]" especially as they relate to the LGN, is not

12 a sufficient indicia of reliability under Rule 702, as elaborated

13 upon by the <u>Daubert</u> Court.  Thus, because plaintiffs have "provided

14 no indication that the opinion or theor[ies] offered by" Dr.

15 Anderson regarding the alleged improper design of the LGN and

16 possible alternative designs "ha[ve] been tested[,]" apart from the

17 nonspecific averment quoted above, plainly "the testing factor of

18 the <u>Daubert</u> analysis cuts against a finding of reliability."  <u>See</u>

19 <u>Martinez</u>, 241 F.R.D. at 638.

20                    ***ii.  Peer Review and Publication***

21     Turning to peer review and publication, this factor also

22 augurs against a finding of reliability.  As with testing, the only

23 mention of peer review and publication in the record is Dr.

24 Anderson's averment, with no elaboration, that the surface

25 treatments which he is advocating have been "peer-reviewed."  <u>See</u>

26 PSOF (doc. 56), exh. D thereto at ¶ 1.  It is not entirely clear

27 from his affidavit, but apparently Dr. Anderson is relying upon the

28 five publications listed therein to show that his opinion that the

1 LGN's surface strength and hence its resistance to fatigue could
2 have been increased by certain surface changes has been peer
3 reviewed and the subject of publications.

4      Merely reciting a list of publications does not establish the
5 level of peer review or publication which Daubert and its progeny
6 contemplate.  Among other things, it cannot be discerned from that
7 list whether any of the cited publications bear directly on the
8 issues before this court.  For example, Dr. Anderson relies upon a
9 publication pertaining to "fatigue behavior . . . for dental
10 implants[.]" See id.  On the face of it, it is difficult if not
11 impossible to see how that publication could show that the surface
12 changes which Dr. Anderson propounds for the LGN, which plainly is
13 not a dental implant, have been subjected to peer review or
14 publication.

15      Likewise, in his affidavit Dr. Anderson names a publication
16 relating to "abrasive waterjet preening[.]" Id.  Yet, plaintiffs
17 have not pointed to anywhere else in this record, such as Dr.
18 Anderson's deposition, showing that he opined that the design of
19 the LGN is defective because it was not subjected to that
20 particular surface treatment technique.  Thus, even if that
21 publication establishes that "abrasive waterjet preening" has been
22 subjected to peer review and publication, the court fails to see
23 how that shows the reliability of Dr. Anderson's proffered
24 opinions, which do not include that particular technique.
25 Accordingly, Dr. Anderson cannot rely upon this particular
26 publication to show that the three surface treatments of which he
27 is a proponent have been subjected to the rigors of peer review or
28 publication.

1    What is more, there is no indication that either of Dr.

2 Anderson's two reports, which were prepared in connection with this

3 litigation, were peer reviewed.  In Martinez, the court held that

4 an expert's reports which were only peer reviewed "in-house,

5 through a co-worker at [the expert's] engineering firm[,]" did not

6 "rise to the level of publication or peer review contemplated in

7 Daubert to test the soundness of methodology used in the analysis."

8 Martinez, 241 F.R.D. at 638 (citing Daubert II, 43 F.3d at 1318)

9 (noting "[t]hat the research is accepted for publication in a

10 reputable scientific journal after being subjected to the usual

11 rigors of peer review is a significant indication that it is taken

12 seriously by other scientists, i.e., that it meets at least the

13 minimal criteria of good science.")).  Dr. Anderson's reports were

14 not subjected to the minimal level of "peer review" described in

15 Martinez, let alone the "usual rigors of peer review" employed in

16 scientific and academic communities.  See Daubert II, 43 F.3d at

17 1318.

18    Further, relying largely upon Dr. Anderson's affidavit,

19 plaintiffs seem to be implying that the "basis supporting [his]

20 opinion can be found based upon the materials he reviewed and his

21 educational and professional experience."  See Martinez, 241 F.R.D.

22 at 639.  The court agrees with the conclusion in Martinez, however,

23 that "[w]hile such factors are relevant, they certainly do not

24 override the important factor of peer review and publication

25 identified in the Daubert inquiry."  See id.  This is especially so

26 here where Dr. Anderson has done nothing more than cite to five

27 publications – two of which on the face of it do not appear to be

28 germane.  Consequently, also as in Martinez, "the lack of peer

1  review or publication regarding Plaintiff[s'] [alleged] design

2  defect and alternative design theories cuts against the reliability

3  of [Dr. Anderson's] opinions regarding such in this case." _See_ _id._

4  ### _iii.  Rate of Error_

5  Plaintiffs indicate that Dr. Anderson "attests[,]" among other

6  things "that the scientific theory behind his compressive force

7  opinions has . . . an error rate[.]" Resp. (Doc. 55) at 5 (citing

8  PSOF (doc. 56) at ¶ 7).  The cited reference does not mention error

9  rates at all, though.  Thus, by omission, plaintiffs concede that

10  there is no known potential rate of error in terms of Dr.

11  Anderson's alternative design theories.  While not dispositive,

12  this factor too weighs against a finding of reliability as to Dr.

13  Anderson's opinion that the LGN is defective due to an improper

14  design, and the purported existence of feasible design

15  alternatives.

16  ### _iv.  General Acceptance_

17  The only reference to general acceptance of Dr. Anderson's

18  opinions is, once again, a cursory statement in his affidavit that

19  his opinions "are accepted in the metallurgical community." _See_

20  PSOF (doc. 56), exh. D thereto at ¶ 1.  The court has no reason to

21  doubt Dr. Anderson's veracity.  Surely _Daubert_ demands more,

22  however, than an expert's conclusory assertion that a given theory

23  has been generally accepted within the relevant scientific

24  community.  Otherwise, the general acceptance criteria would be

25  rendered meaningless because it could be met by "the expert's bald

26  assurance of validity[,]" which in a slightly different context the

27  Ninth Circuit has found does not comport with _Daubert_.  _See_ _Daubert_

28  _II_, 43 F.3d at 1316.

1                      ***v.  Litigation Generated Opinions***

2        In further recognition of the flexible nature of the Daubert

3   inquiry, the Ninth Circuit has "provided additional guidance[]" for

4   evaluating the reliability of an expert's opinion.  Lust, 89 F.3d

5   at 597.  One "very significant" additional factor "is whether the

6   experts are proposing to testify about matters growing naturally

7   and directly out of research they have conducted independent of the

8   litigation, or whether they have developed their opinions expressly

9   for purposes of testifying."  Daubert II, 43 F.3d at 1317.  Dr.

10  Anderson's research was not done "independent of th[is]

11  litigation."  See id. Instead, as should be abundantly clear by

12  now, his opinions were "developed . . . expressly for purposes of

13  testifying" in this action.  See id.  Therefore, it is incumbent

14  upon plaintiffs, as the proponents of Dr. Anderson's testimony, to

15  come forth with "proof that the research and analysis supporting

16  the proffered conclusions have been subjected to normal scientific

17  scrutiny through peer review and publication."  See id. at 1318.

18  As discussed above, plaintiffs have made no such showing here.

19       To be sure, it "is not dispositive[]" that an "expert failed

20  to subject his method to peer-review and to develop his opinion

21  outside the litigation."  Lust, 89 F.3d at 597.  "[B]ut if these

22  guarantees of reliability are not satisfied," id., the expert must

23  "explain precisely how [he] went about reaching [his] conclusions

24  and point to some objective source - a learned treatise, the policy

25  statement of a professional association, a published article in a

26  reputable scientific journal or the like - to show that [he has]

27  followed the scientific method, as it is practiced by (at least) a

28  recognized minority of scientists in [his] field.'"  Daubert II, 43

1  F.3d at 1318-19 (citing <u>United States v. Rincon</u>, 28 F.3d 921, 924

2  (9th Cir. 1994) (research must be described "in sufficient detail

3  that the district court [can] determine if the research is

4  scientifically valid")) (footnote omitted).  Dr. Anderson's

5  testimony does not meet this standard.

6       Dr. Anderson did not explain precisely how he derived his

7  conclusion that the LGN is defective.  He does not identify, let

8  alone explain, the principles or the methods he used to arrive at

9  this conclusion.  Citing to five publications and baldly averring

10 that they are "supportive of []his science and [his] opinion[]" is

11 not the sort of "precise" explanation <u>Daubert</u> and the case law

12 construing it mandates.  In fact Dr. Anderson's averment that his

13 opinions were "tested and peer-reviewed and accepted in the

14 metallurgical community[,]" is the type of "self-serving" assertion

15 which the <u>Daubert II</u> Court indicated cannot "be deemed conclusive."

16 <u>See Daubert II</u>, 43 F.3d at 1315-1316.  Plaintiffs, as the party

17 proffering Dr. Anderson's testimony, have not come close to

18 "explain[ing] [Dr. Anderson's] methodology and demonstrat[ing] in

19 some objectively verifiable way that [he] has both chosen a

20 reliable scientific method and followed it faithfully."  <u>See</u>

21 <u>Daubert II</u>, 43 F.3d at 1319 n.11.  As in <u>Daubert II</u>, plaintiffs

22 "neither explain the methodology [Dr. Anderson] followed to reach

23 [his] conclusions nor point to any external source to validate that

24 methodology."  Dr. Anderson's conclusory averment quoted above does

25 not allow the court, as it must, "to determine whether the expert

26 has utilized the correct principles and methods, or whether they

27 have been reliably applied in the particular case[]" as Rule 702

28 requires.  <u>See In re Canvas Specialty, Inc.</u>, 261 B.R. 12, 21

1  (Bankr. D.C.Ca. 2001).

2      Dr. Anderson provides no insight, for example, into the

3  methodology he used to determine that his three suggested surface

4  treatment techniques, in fact, would have resulted in increased

5  resistance to fatigue in the LGN.   In contrast to the experts'

6  declarations in Metabolife International, Inc. v. Wornick, 264 F.3d

7  832 (9th Cir. 2001), which the Ninth Circuit found "facially

8  complied with Daubert II's verification requirement for evidence

9  prepared in anticipation of litigation[,]" Dr. Anderson has not

10  "explain[ed] [his] methodology" at all.   See id. at 845 (citation

11  omitted).   Equally significant is the fact that Dr. Anderson did

12  not show "how the data found in [the cited] peer-reviewed"

13  documents "was used."   See id. (citation omitted).   Moreover, Dr.

14  Anderson has not tied his opinion to the facts of this particular

15  case, making it extremely difficult for the court to properly

16  exercise its "gatekeeping inquiry" as Daubert mandates.   See

17  Cooper, 510 F.3d at 942 (internal quotation marks and citations

18  omitted)("[T]he gatekeeping inquiry must be tied to the facts of a

19  particular case.") "[N]othing in either Daubert or the Federal

20  Rules of Evidence requires a district court to admit opinion

21  evidence that is connected to existing data only by the *ipse dixit*

22  of the expert."   General Elec. Co. v. Joiner, 522 U.S. 136, 146,

23  118 S.Ct. 512, 519 (1997).   Yet, by offering Dr. Anderson's largely

24  unsubstantiated testimony, essentially, this is what plaintiffs are

25  asking this court to do.

26                    ***vi.  Other Criteria***

27      Partly because Dr. Anderson's opinion testimony does not fit

28  neatly into the Daubert and Rule 702 framework, and cognizant of

1  the flexible nature of that inquiry,[14] the court will briefly

2  examine some additional factors which it deems pertinent in

3  assessing the reliability of his testimony.   The court stresses

4  that individually none of these factors is determinative.   Taken

5  together, and especially because Dr. Anderson's testimony does not

6  satisfy even one of the four Daubert criteria, these additional

7  factors further undermine the reliability of his testimony however.

8      Dr. Anderson admitted that he did not "look[]" at "the process

9  through which [the LGN] went in order to initiate and ultimately

10 obtain FDA [Food and Drug Administration] approval[.]" DSOF (doc.

11 44), exh. B thereto (Anderson Dep'n) at 111:5-8.   In fact, Dr.

12 Anderson did not review any FDA filings in connection with this

13 action.   Id. at 31:8-10.   He does not "believe" that he has "seen

14 the product data insert sheet that accompanied the [LGN] implanted

15 in Mr. Harrison[.]" Id. at 32:21-24.   Nor did he ask for it.   Id.

16 at 32:25-33:1.   Likewise, Dr. Anderson did not "undertake[] any

17 investigation of the clinical history or performance of [the LGN]

18 of the type implanted in Mr. Harrison[.]" Id. at 30:23-31:2.   Thus,

19 having carefully scrutinized Dr. Anderson's reports, his affidavit,

20 and the cited excerpts from his deposition, the court is forced to

21 conclude that much of his proffered testimony falls into the

22 category of "unsubstantiated speculation and subjective beliefs."

23 See Cooper, 510 F.3d at 942 (internal quotation marks and citation

24 omitted).   Dr. Anderson's comment that the LGN is defective because

25 the manufacturer "spen[t] 25 years with [it] and [did] not spend a

26

27 _____

28      [14]    See Desrosiers v. Flight Intern. of Florida Inc., 156 F.3d 952, 961 (9th
Cir. 1998) (citing cases) (The Ninth Circuit "repeatedly has stated that a district
court's inquiry under both Rule 702 and Daubert is a flexible one.")

1  little bit of research and effort to try and increase the

2  resistance to fatigue[,]" is illustrative.  See PSOF (doc. 56),

3  exh. A thereto (Anderson Dep'n) at 68:21-24.  At the end of the

4  day, as in Daubert II, this court has not been presented with much

5  more than Dr. Anderson's qualifications, his conclusions and his

6  "assurances of reliability[]" set forth in his affidavit.  See

7  Daubert II, 43 F.3d at 1319.  Plainly Rule 702 and Daubert require

8  more.

9       For all of these reasons, on this record the court finds,

10 succinctly put, that "there is simply too great an analytical gap

11 between the data and the opinion[s] proffered[]" by Dr. Anderson.

12 See Joiner, 522 U.S. at 146, 118 S.Ct. at 519 (citation omitted).

13 Thus, because as discussed above plaintiffs have not satisfied any

14 of the Daubert factors, or otherwise shown sufficient indicia of

15 reliability with respect to Dr. Anderson's proffered testimony, the

16 court, in its gatekeeping capacity, finds that his testimony does

17 not comport with Rule 702 or Daubert in terms of reliability.

18            ***b.  Relevancy***

19      Although the court could exclude Dr. Anderson's testimony

20 based on its lack of reliability alone, it will briefly consider

21 the relevancy prong of Daubert as well.  Under Daubert, "relevance

22 means that the evidence will assist the trier of fact to understand

23 or determine a fact in issue."  Cooper, 510 F.3d at 942 (citing

24 Daubert, 509 U.S. at 591-92, 113 S.Ct. 2786).  "Encompassed in the

25 determination of whether expert testimony is relevant is whether it

26 is helpful to the jury, which is the central concern of Rule 702."

27 Id. (internal quotation marks and citation omitted).  Addressing

28 the passing reference to "'fit'" in Daubert, which "'goes primarily

to relevance,'" the Ninth Circuit in <u>Daubert II</u> espoused the view that "obviously" the Supreme Court "did not intend this prong of Rule 702 "to be merely a reiteration of the general relevancy requirement of 402." <u>Daubert II</u>, 43 F.3d at 1321 n. 17 (quoting <u>Daubert</u>, 509 U.S. at ___, 113 S.Ct. at 2795). This seemingly broader, heightened relevance standard is necessary, from the Ninth Circuit's perspective, given the Supreme Court's recognition "that scientific expert testimony carries special dangers to the fact-finding process because it 'can be both powerful and quite misleading because of the difficulty in evaluating it.'" <u>Id.</u> (quoting <u>Daubert</u>, 509 U.S. at ___, 113 S.Ct. at 2798) (other quotation marks and citations omitted). Thus, the Ninth Circuit has instructed that "[f]ederal judges *must* . . . *exclude* proffered scientific evidence under Rules 702 and 403 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." <u>Id.</u> (emphasis added).

Under that standard, the court must exclude Dr. Anderson's testimony which it has found to be inherently unreliable. Allowing a jury to consider such unreliable evidence obviously would be misleading, in direct contravention of <u>Daubert</u>. Therefore, the court finds that not only is Dr. Anderson's testimony not reliable, it is also not relevant within the meaning of Rule 702.

### *3. Fed. R. Evid. 403*

Finally, the court would be remiss if it did not recognize the existence of one additional "important constraint" on Dr. Anderson's proffered testimony, which is Fed. R. Evid. 403. <u>Jinro America</u>, 266 F.3d at 1005. Even "[o]therwise admissible expert

1  testimony may be excluded under [that Rule] if its probative value
2  is substantially outweighed by the danger of unfair prejudice,
3  confusion of the issues, or undue delay." Id. at 1006.  Such is
4  the case here.  Given the court's finding that Dr. Anderson's
5  testimony is both unreliable, and hence not relevant, the court
6  necessarily concludes that the prejudicial effect of such testimony
7  outweighs its probative value.  Accordingly, for all of the reasons
8  previously discussed, the court grants Howmedica's motion to
9  exclude the testimony of Dr. Robert N. Anderson.

10  **IV.   Summary Judgment**

11        **A.  Governing Legal Standards**

12        Pursuant to Fed.R.Civ.P. 56(c), a party is entitled to summary
13  judgment "if the pleadings, depositions, answers to
14  interrogatories, and admissions on file, together with the
15  affidavits, if any, show that there is no genuine issue as to any
16  material fact and that the moving party is entitled to a judgment
17  as a matter of law."   It is beyond dispute that "[t]he moving
18  party bears the initial burden to demonstrate the absence of any
19  genuine issue of material fact." Horphag Research Ltd. v. Garcia,
20  475 F.3d 1029, 1035 (9th Cir. 2007) (citation omitted).

21        "Once the moving party meets its initial burden, ..., the
22  burden shifts to the nonmoving party to set forth, by affidavit or
23  as otherwise provided in Rule 56, specific facts showing that there
24  is a genuine issue for trial." Nidds v. Schindler Elevator Corp.,
25  113 F.3d 912, 916 (9th Cir. 1996) (internal quotation marks and
26  citations omitted).  When assessing the record to determine whether
27  there is a "genuine issue for trial," the court must "view the
28  evidence in the light most favorable to the nonmoving party,

1  drawing all reasonable inferences in his favor." <u>Horphaq</u>, 475 F.3d

2  at 1035 (citation omitted).  Likewise, the court may not make

3  credibility determinations; nor may it weigh conflicting evidence.

4  <u>See</u> <u>Anderson</u>, 477 U.S. at 255. Thus, as framed by the Supreme

5  Court, the ultimate question on a summary judgment motion is

6  whether the evidence "presents a sufficient disagreement to require

7  submission to a jury or whether it is so one-sided that one party

8  must prevail as a matter of law."  <u>Id.</u> at 251-52.

9       ***B.  Theories of Liability***

10      Plaintiffs' complaint is not the model of case theory

11  definition.  Under the heading "Amended Complaint" they list

12  "Products Liability, Strict Liability, Res Ipsa Loquitur, [and]

13  Negligence[.]" Amended Co. (Doc. 14) at 1.  In the body of that

14  complaint plaintiff did not differentiate among any of those

15  claimed theories, however.  Instead, quoting practically verbatim

16  from ARS § 12-681(5)'s definition of a "product liability

17  action[,]" plaintiffs sweepingly allege that the LGN is defective

18  in manufacturing, design, and due to a failure to warn. <u>See</u> <u>id.</u> at

19  5, ¶ 31.  Next, plaintiffs broadly allege that "[t]he manufacture,

20  design and warnings placed on [the LGN] were negligently

21  performed."  <u>Id.</u>  As part of their negligence claim, plaintiffs

22  further allege that the LGN "was insufficient for the purpose for

23  which it was sold or otherwise designed."  <u>Id.</u> at 5, ¶ 33.

24      This court, sitting in diversity jurisdiction, must apply

25  state law to plaintiffs' negligence and strict product liability

26  claims.  <u>See</u> <u>Stilwell</u>, 482 F.3d at 1193-94 (citations omitted).

27  "Arizona permits tort claims against medical device

28  manufacturers[,]" such as Howmedica.  <u>See</u> <u>id.</u> at 1194 citation

omitted).  Arizona has adopted the Restatement (Second) of Torts strict liability and negligence standards.  Id. (citations omitted).

"To establish a prima facie case for strict products liability in Arizona, a plaintiff must show that the product was in a defective condition (when it left the defendant's hands), that the defect made the product unreasonably dangerous, and that the defect was a proximate cause of plaintiff's injuries."  Southwest Pet Products, Inc. v. Koch Industries, Inc., 273 F.Supp.2d 1041, 1051 (D.Ariz. 2003) (citation omitted).  "Failure to prove any of these elements is fatal."  Gebhardt v. Mentor Corp., 191 F.R.D. 180, 184 (D.Ariz. 1999) (citation omitted), aff'd on other grounds without pub'd opinion, 15 Fed.Appx. 540 (9th Cir. 2001).

"There are three categories of defects in strict products liability actions: manufacturing defects; design defects; and informational defects in regard to instructions and warnings."  Southwest Pet Products, 273 F.Supp.2d at 1051 citation omitted).  As should be evident by now the only category of defect which is seriously contested on this motion is that of design defect.  Nonetheless, in part because Howmedica separately moved on each of these defect theories (and to be thorough), the court will briefly address the manufacturing and informational defects before turning to the design defect issue.

### 1.  Manufacturing Defects

"A defectively manufactured product is one that is flawed as a result of something that went wrong during the manufacturing process."  Id. at 1051 n. 15 (internal quotation marks and citation omitted).  Plaintiffs expressly "concede[] that [Dr. Anderson] is

1  not going to offer any opinions . . . that the metal alloy

2  specified and used in the product was not appropriate." DSOF (doc.

3  44) at 13, ¶ 54 (citation omitted); <u>see also</u> PSSOF at 5, ¶ 54.  Not

4  only that, plaintiffs also expressly admit, as the Lee*Group* report

5  found, "that the [LGN] failed due to fatigue and was free from

6  manufacturing defects[.]" <u>Id.</u> at 8, ¶ 38 (citation omitted); <u>see</u>

7  <u>also</u> PSSOF (doc. 68 – dup. Of 66) at 2.  Consequently, the court

8  grants Howmedica's motion insofar as it is seeking summary judgment

9  as to plaintiffs' claims, whether sounding in strict product

10 liability or negligence, premised upon a manufacturing defect.

11      ***2.  Informational Defects***

12     In a similar vein, plaintiffs expressly admit that Dr.

13 Anderson "is not going to offer any opinions regarding . . .

14 defective or inadequate warnings[.]" DSOF (doc. 44) at 13, ¶ 54

15 (citation omitted); <u>see also</u> PSSOF at 5, ¶ 54.  In the absence of

16 such proof, the court also grants summary judgment in favor of

17 Howmedica to the extent plaintiffs are seeking to recover in strict

18 product liability or negligence based upon alleged defects in

19 instructions and warnings.

20      ***3.  Design Defects***

21     Dr. Anderson is plaintiffs' only expert witness on the issue

22 of design defect.  Because the court is excluding his testimony and

23 reports, the issue thus becomes whether there remains sufficient

24 evidence to allow plaintiffs to withstand summary judgment on their

25 design defect claims, whether couched in terms of strict liability

26 or negligence.

27     In Arizona, a plaintiff cannot prevail in a strict products

28 liability action based on "proof of the defect alone[.]" <u>Southwest</u>

1    Pet Products, 273 F.Supp.2d at 1051 (citation omitted).   Instead,

2    "a strict [product] liability claim arises when a product is in a

3    defective condition unreasonably dangerous, . . . *and* the product

4    fail[s] to perform as safely as an ordinary consumer would expect

5    when used in an intended or reasonable manner (the consumer

6    expectation test), *or* the benefits of the challenged design . . .

7    outweigh the risk of danger inherent in the design[.]"   Stilwell,

8    482 F.3d at 1194 (internal quotation marks and citations omitted)

9    (emphasis added).   Relying upon Gebhardt, Howmedica urges this

10   court to find, in effect, that as a matter of law the LGN was not

11   in a "defective condition unreasonably dangerous."

12        The Gebhardt court granted summary judgment in favor of a

13   medical device manufacturer because the plaintiff "failed to

14   demonstrate that a reasonable health-care provider would not

15   prescribe the [device] for any class of patients and thus that

16   th[at] [device] was defectively designed."   191 F.R.D. at 185

17   (footnote omitted).   In so holding, the court "look[ed] to the

18   Restatement (Third) of Torts"[15] which states in pertinent part:

19              A prescription drug or medical device is not
             reasonably safe due to defective design if the
20           foreseeable risks of harm posed by the drug or
             medical device are sufficiently great in relation
21           to its foreseeable therapeutic benefits that
             reasonable health-care providers, knowing of such
22           foreseeable risks and therapeutic benefits, would
             not prescribe the drug or medical device for any
23           class of patients.

24   Id. (quoting Restatement, § 6(c)).   Applying that standard,

25   the Gebhardt court reasoned that summary judgment in the

26   manufacturer's favor on "Plaintiff's design defect claim[]" was

27   _____

28       [15]   Unless otherwise indicated, hereinafter all references to the
     "Restatement" shall be read as referring to this version.

1  "proper" because one of plaintiffs' experts "testified that he

2  might have used the [device] if confronted with Plaintiff's medical

3  condition in the operating room." Id. (citation omitted).

4        Given the testimony of two of Mr. Harrison's treating

5  physicians, Howmedica argues that like the medical device

6  manufacturer in Gebhardt it, too, is entitled to summary judgment

7  on plaintiffs' design defect claims.  In particular, Dr. Price, the

8  physician who first implanted the LGN, was asked "as between the

9  [LGN] and whatever else was available at the time, how did [he]

10 come to select the [LGN]?"  Mot. to Strike, etc. (doc. 63) at 6, ¶

11 5 (citing deposition of Dr. Price (Jan. 5, 2007) at 16:14-17).  He

12 responded: "Experience, ease of availability and an excellent track

13 record." Id. (citing Price Dep'n at 16:18-19).  Inquiring as to

14 what he meant by "excellent track record[,]" Dr. Price agreed that

15 he was "speaking personally and with regards to the experience of

16 [his] partners and others that [he] know[s] of firsthand from [his]

17 practice . . . in Missoula[,]" Montana.  Id. (citing Price Dep'n at

18 17:9-14).

19       To clarify his statement that he "had used this device

20 exclusively since 2001[,]" Dr. Price was further asked, "When you

21 use the term 'this device' are you referring specifically to the

22 Howmedica product?"  Id. (citing Price Dep'n at 16:20-23).  Dr.

23 Price answered affirmatively, explaining that when he said

24 "exclusively, there may be a DHS there now and again for particular

25 purposes, but for a primary intertrochanteric hip fracture that was

26 [his] device of choice[,]" and it "still" is. Id. (citing Price

27 dep'n at 16:25-17:5).  Thus, since August of 2003, when he used the

28 LGN on Mr. Harrison, to the time of his deposition in January,

1  2007, Dr. Price estimates that he has used the LGN "[p]robably

2  40[]" times.   Id. (citing Price dep'n at 17:6-8).

3      To bolster its argument based upon section 6(c), Howmedica

4  also relies upon the testimony of Dr. Camarata, one of Mr.

5  Harrison's treating physicians in Arizona.   Howmedica points out

6  that Dr. Camarata "testified that he ha[d] no criticisms of Dr.

7  Price's decision to use the LGN, but would choose a different

8  device because of personal preference[.]" Reply (doc. 62) at 6

9  (citation omitted). Based upon the preceding testimony, Howmedica

10 asserts that it is entitled to summary judgment on plaintiffs'

11 design defect claim because "[p]laintiffs cannot establish that a

12 reasonable health-care provider would not utilize [the LGN] in

13 treating patients[.]" Id.

14     Given the potentially significant impact of Gebhardt, combined

15 with the fact that Howmedica presented this argument almost as an

16 afterthought,[16] the court ordered plaintiffs to file a sur-reply

17 "addressing the applicability, if any, of the Restatement (Third)

18 of Torts, Section 6(c) to the present case."   Doc. 69 at 4.

19 Plaintiffs' sur-reply is not directly responsive to that specific

20 issue.   Instead, without discussing section 6(c) or Gebhardt,

21 plaintiffs broadly counter that the governing legal standard is

22 "'whether a reasonable manufacturer, with knowledge of such

23 dangers, nevertheless would have put the product on the market.'"

24 Sur-Reply (doc. 72) at 2 (quoting Dart v. Wiebe Manufacturing,

25 Inc., 147 Ariz. 242, 249, 709 P.2d 876, 883 (1985)).   Plaintiffs

26 further note that application of that standard requires an analysis

27 _____

28     [16]     Despite otherwise fairly extensive briefing, this is the penultimate
   argument, summarily presented, in Howmedica's Reply.

1  of seven risk/benefit factors.  See id. at 2-3 (citation omitted).

2  Enumerating those factors, but without indicating where in the

3  record there is any supporting evidence, plaintiffs baldly assert

4  that they have "demonstrated a viable claim that should be

5  presented to a jury."  Id. at 3.

6      The court is fully cognizant that Arizona has not "formally

7  adopted" the Restatement (Third).  See Gebhardt, 191 F.R.D. at 185.

8  By the same token, though, "Arizona has demonstrated a willingness

9  to look to" that particular version of the Restatement "as the

10 current statement of the law[.]"  Id. (citing Jimenez v. Sears,

11 Roebuck & Co., 183 Ariz. 399, 904 P.2d 861, 867 (1995)).  That

12 willingness continues to this day.  See, e.g., 1800 Ocotillo, LLC

13 v. WLB Group, Inc., ___ P.3d ___, 2008 WL 240949, at *8 (Ariz. App.

14 Div. 1 Jan. 29, 2008) (citing to the Restatement with respect to

15 apportionment of liability to support the holding that "a

16 contractual provision limiting the amount of damages for a party's

17 negligence is a form of assumption of risk[]").  Thus (and given

18 the absence of any compelling reason not to do so by plaintiffs),

19 as did the Gebhardt court, this court will apply section 6(c) of

20 the Restatement.  When it does that, the result is the same as in

21 Gebhardt.  Plaintiffs have not "demonstrated that a reasonable

22 health-care provider would not prescribe the [LGN] for *any class of*

23 *patients* and thus that the [LGN] was defectively designed."  See

24 Gebhardt, 191 F.R.D. at 185 (footnote omitted) (emphasis added.[17]

25 ─────────────────

26      [17]    Accord Madsen v. American Home Products Corp., 477 F.Supp.2d 1025, 1037
   (E.D. Mo. 2007) (applying § 6(c) and finding that plaintiff "failed to establish
   a genuine issue of mater fact on her design defect claims" as to certain diet drugs

27 where she did "not present[] any evidence that reasonable health-care provides,
   knowing the risks and benefits, would not have prescribed [those drugs] to any
   class of patients[]"); Taylor v. Danek Medical, Inc., 1998 WL 962062, at *7

28 (E.D.Pa. 1998) (quoting Restatement § 6(c)) (granting summary judgment in favor of

1  Indeed, as detailed above, the record proof is to the contrary.

2  Health-care providers, such as Dr. Price, would and continue to use

3  the LGN for patients who have sustained fractures such as that

4  sustained by Mr. Harrison.

5      Having scrutinized the record, the court is aware that

6  Howmedica rather selectively quoted from Dr. Camarata on this

7  point.  Almost immediately after testifying, as Howmedica notes,

8  that he would not use the LGN because of "personal preference[,]"

9  Dr. Camarata testified: "The reason a lot of us never used [the

10  LGN] was that it had a history of, *not* fracture where his nail did,

11  but fracture at the tip of that nail."  Mot. to Strike, etc. (doc.

12  63), exh. B thereto (Camarata Dep'n at 46:20-23).  As Dr. Camarata

13  colloquially put it, "That was the big knock on that nail."  Id.,

14  exh. B thereto at 46:23.

15      Even taking into account Dr. Camarata's full testimony on this

16  point, given the seemingly demanding standard of section 6(c), the

17  court remains convinced that plaintiffs have not met their burden

18  of proof thereunder.  "The comments to § 6 elaborat[ing] on the

19  requirements for establishing a defective design of a . . . medical

20  device" thereunder further support this view.  Madsen, 477

21  F.Supp.2d at 1037.  More specifically, those comments state, among

22  other things, that a "medical device that has usefulness to *any*

23  *class of patients* is not defective in design even if it is harmful

24  to other patients."  Id. (quoting Restatement, § 6, comment b)

25  _____

26  bone screw manufacturer on strict liability design defect claim where plaintiffs
    did not "come forward with any evidence which would support a claim that 'the
27  foreseeable risks of harm posed by the . . . medical device [we]re sufficiently
    great in relation to its foreseeable therapeutic benefits that reasonable health-
28  care providers, knowing of such foreseeable risks and therapeutic benefits, would
    not prescribe the . . . medical device for any class of patients[]'").

1  (emphasis added).  In light of the foregoing, although there is

2  proof in this record that some health care providers did not use

3  the LGN because of its "history of . . . fractur[ing] at the

4  tip[,]" there is also contrary proof.  See Mot. to Strike, etc.

5  (doc. 63), exh. B thereto (Camarata Dep'n at 46:20-23).

6  Consequently, plaintiffs have not met their burden under section

7  6(c).

8       As in Gebhardt, there is an alternative basis for finding the

9  LGN does not have a design defect within the meaning of the

10  Restatement, and hence that summary judgment in Howmedica's favor

11  is proper.  Section two of the Restatement "defines a defectively-

12  designed product as one where the foreseeable risks of harm posed

13  by the product could have been reduced or avoided by the adoption

14  of a reasonable alternative design."  Gebhardt, 191 F.R.D. at 185

15  n.2 (internal quotation marks omitted).  Based upon the admission

16  by plaintiffs' experts in Gebhardt "that there was no way that the

17  [medical device] could have been redesigned to avoid the

18  erosion[,]" the court held that the device at issue was not

19  defectively designed as section two defines it.  Id. (citations

20  omitted).

21       The same is true here.  Howmedica's metallurgist decisively

22  opined, "Creation of a fixation device that will never fracture is

23  not feasible, and this fact is well known in the industry."  DSOF

24  (doc. 44) at 12, ¶ 50; and exh. M thereto (PE Report) at 4, ¶ 8.

25  Plaintiffs do not expressly refute dispute this.  Instead, they

26  resort to Dr. Anderson's general opinion "that the [LGN] is

27  defectively designed[.]" PSSOF (doc. 68) at 4, ¶ 50 (citation

28  omitted).  As previously discussed, however, the court is not

1 considering Dr. Anderson's testimony.  Therefore, the record as

2 presently constituted supports a finding, as in <u>Gebhardt</u>, that the

3 LGN is not a defectively designed product under section 2 of the

4 Restatement.

5     Even disregarding <u>Gebhardt</u> and its application of the

6 Restatement (Third), nonetheless, the court finds that summary

7 judgment is proper on plaintiffs' design defect claims.  The Ninth

8 Circuit's decision in <u>Stilwell</u> provides a basis, apart from

9 sections two and 6(c) of the Restatement (Third), for granting that

10 relief.  In <u>Stilwell</u>, a case remarkably similar to the present one,

11 plaintiff  brought a product liability action against the

12 manufacturer of metal reconstruction nails which were used "to

13 stabilize a compound . . . fracture of her right femur."  <u>Stilwell</u>,

14 482 F.3d at 1188 (footnote omitted).  The "two nails failed during

15 the healing process, causing [plaintiff] pain, suffering, and

16 disability."  <u>Id.</u>  "[R]eject[ing] her claims for lack of proof of

17 causation[,]" the district court granted summary judgment in favor

18 of the manufacturer.  <u>Id.</u>  The Ninth Circuit held that the district

19 court "wrongly excluded the testimony" of plaintiff's expert

20 metallurgist.  <u>Id.</u> at 1189.  Nonetheless, the Ninth Circuit

21 affirmed "because evidence . . . , including [the expert's]

22 deposition testimony and reports, d[id] not demonstrate that any

23 alleged defects were a cause of the delayed healing of

24 [plaintiff's] fractured leg."  <u>Id.</u>

25     Regardless of whether they are framed in terms of strict

26 liability or negligence, the Ninth Circuit stated that plaintiff's

27 claims "must rely on the allegation that [the] product is

28 defective."  <u>Id.</u> at 1194 (citations omitted).  To determine whether

1  a given product is defective requires "some understanding of the

2  product's purpose." Id. (citation omitted).  The Stilwell Court

3  found that plaintiff "failed to provide" that evidence to the

4  district court though.  Id.  The Court explained that plaintiff did

5  "not point[] to any evidence, beyond her doctors' impressions

6  regarding the failure rate of the . . . nail, to explain to a jury

7  the intended duration of its use, which she conceded was not

8  indefinite."  Id.  The Ninth Circuit further noted the "contrary"

9  proof before the district court.  See id.  One of plaintiff's

10  doctors had "expressed concern that [her] cigarette use would

11  impede her healing and [another] [had] stated that he would not be

12  surprised if an intermedullary rod, like [plaintiff's], failed

13  after one year, which is longer than the time expected for the

14  healing process."  Id.

15      On appeal plaintiff also "did not rely on any record

16  evidence to support [her] contention[]" that "at a minimum, the

17  second . . . nail should have performed longer than it did[.]"  Id.

18  at 1195.  Instead, she "repeatedly reminded [the Circuit Court]

19  that her treating physicians testified that a . . . nail failure is

20  rare[.]" Id.  The Stilwell Court held that plaintiff's "vague

21  arguments regarding the expected life of the . . . nail . . . d[id]

22  not refute [the manufacturer's] evidence that the . . . nails

23  performed as intended in th[at] case."  Id.  Therefore, the Court

24  concluded that the evidence did "not establish that the . . . nails

25  in question caused any actionable harm to [plaintiff]."  Id.

26      There is a similar lack of record evidence before this court.

27  Plaintiffs have "not pointed to any evidence, . . . , to explain to

28  a jury the intended duration of [the LGN's] use[.]" See id. at

1194.   Much like Stilwell, plaintiffs are relying upon "doctors'

impressions regarding the failure rate" of the LGN.  See id.  In

particular, one of Mr. Harrison's physicians, Dr. Camarata,

testified that "it's extremely unusual for this nail to break,

anytime.   It's even more unusual for the nail to break at three

months."  Mot. to Amend and Notice of Erratum (doc. 58), exh. D

thereto (Camarata Dep'n) at 108:13-15.   Plaintiffs add that

Howmedica's orthopaedic expert agreed that in his "experience[,]"

he had "never seen [a LGN] fail or break in this short of period of

time as did [Mr. Harrison's][.]" Id., exh. B thereto (Marrone

Dep'n) at 42:11-14.   "[R]arity does not indicate infallibility[,]"

however, as the Ninth Circuit so aptly stated when confronted with

similar evidence in Stilwell.   See Stilwell, 482 F.3d at 1195.

In their Response, plaintiffs further contend that "there is

evidence Howmedica intended the [LGN] to last longer than the 14

weeks it did[,]" and thus there is a "jury issue" because the LGN

"failed so soon[.]" See Resp. (doc. 53) at 2.  Yet, plaintiffs do

not cite to anywhere in this extensive record to support that

contention.   See Resp. (doc. 53) at 2.   Plaintiffs' SOF does

include cites, but careful examination of the cited references

reveals that they pertain only to the undisputed fact that "Mr.

Harrison's fracture was healing at the time the [LGN] broke."  See

Mot to Strike (doc. 63) at 4, ¶ 3; see also PSOF (doc. 54) at 2-3,

¶ 3 (and cited references).   Those references do not show that

Howmedica intended the product to last for any particular period of

time.

On the other hand, Dr. Price, also one of Mr. Harrison's

treating physicians, unequivocally testified that in his "opinion

1  . . . the [LGN] did what it was supposed to do."  DSOF (doc. 44) at

2  11, ¶ 47; and exh. D thereto (Price Dep'n) at 10:9-10.  In a

3  similar vein, Dr. Camarata agreed that he does "[n]ot always[]

4  . . . equate a breaking device with a defective device[.]" Reply

5  (doc. 62) at 3 (quoting Mot. to Strike (doc. 63), exh. B thereto

6  (Camarata Dep'n) at 76:14-16).  Further, when asked whether

7  "implantable medical devices can fail for reasons having nothing at

8  all to do with whether there's a defect in the product[,]" Dr.

9  Camarata responded, "True."  Id. (quoting Mot. to Strike (doc. 63),

10  exh. B thereto (Camarata Dep'n) at 76:17-20).

11      As just explained, in response to the foregoing, plaintiffs

12  have not come forth with any "concrete evidence" showing that there

13  is a genuine issue for trial with respect to the intended duration

14  of the LGN's use – evidence which the Stilwell Court deemed

15  critical to surviving the manufacturer's summary judgment motion

16  there.  At most plaintiff have "vague arguments regarding the

17  expected life of the" LGN.  See Stilwell, 489 F.3d at 1194.  This

18  "vague argument" is based upon Howmedica's initial disclosure

19  indicating that the LGN  "is designed for temporary stabilization

20  of bone segments until bone consolidation has been achieved[.]"

21  PSOF (doc. 54), exh. B thereto.  From that, plaintiffs contend that

22  "a jury can readily infer that Howmedica intended the [LGN] to last

23  until the reasonably expected time for bony consolidation, which

24  the doctor's [sic] and material scientists in this case agree

25  typically takes longer than 14 weeks, including in Mr. Harrison's

26  case."  Resp. (doc. 53) at 3.  Plaintiffs are disregarding the

27  fact, however, that only reasonable inferences may be drawn in

28  opposing summary judgment.  See Ackerman v. Western Elec. Co. Inc.,

1  860 F.2d 1514, 1520 (9th Cir. 1988) (internal quotation marks and
2  citation omitted) (emphasis added by Ackerman Court) ("A party
3  opposing summary judgment is entitled to the benefit of only
4  *reasonable* inferences that may be drawn from the evidence put
5  forth.")

6      "Inferences, . . . , cannot be drawn out of 'thin air';
7  instead, the proponent must adduce evidence of a factual predicate
8  from which to draw inferences." Highlen v. Johanns, 2007 WL
9  220777, at *4 (S.D.Cal. 2007) (quoting American Int'l Group, Inc.
10 v. American Int'l Bank, 926 F.2d 829, 836 (9th Cir. 1991)).  That
11 factual predicate is missing here.  Plaintiffs have not pointed to
12 record evidence that "bony consolidation . . . typically takes
13 longer than 14 weeks[.]" See Resp. (doc. 53) at 3.  Moreover, it is
14 undisputed that Mr. Harrison's fracture was healing, but the bones
15 had not yet unionized when the LGN broke.  See, e.g., Mot. to
16 Strike, etc. (doc. 36) at 4, ¶ 3; and Mot. to Amend and Notice of
17 Erratum (doc. 58), exh. D thereto (Camarata Dep'n) at 30:22-31:1
18 (agreeing that Mr. Harrison did not "have full bone union" when Dr.
19 Camarata saw him "on the last office visit" before the LGN broke).
20 To withstand summary judgment, plaintiffs must rely on something
21 more than "'mere speculation, conjecture, or fantasy[.]'" See Bates
22 v. Clark County, 2006 WL 3308214, at * 2 (D.Nev. Nov. 13, 2006)
23 (quoting O.S.C. Corp. v. Apple Computer, Inc., 792 F.2d 1464, 1467
24 (9th Cir. 1986)).  Yet in the end, that is all that plaintiffs are
25 left with in the present case.

26     Plaintiffs attempt to distinguish Stilwell because of the
27 different time frames involved.  In Stilwell one nail failed at
28 three years and another at twenty months, whereas the LGN here

1  failed at 14 weeks.  Plaintiffs further note that in Stilwell

2  plaintiff's doctor testified "that he would not be surprised if [a

3  nail], . . ., failed after one year, which is longer than the time

4  expected for the healing process."  Stilwell, 484 F.3d at 1194.

5  These factual distinctions do not undermine Stilwell's

6  applicability here, however.  The court does not find these factual

7  differences determinative given that the crux of the Court's

8  holding in Stilwell was the absence of any evidence regarding the

9  nails' intended duration.  Here, plaintiffs have similarly failed

10 to direct the court to such evidence.  As in Stilwell, the court

11 believes that it is being "ask[ed] . . . to blindly accept the

12 . . . [LGN's] failure before [Mr. Harrison's] fracture healed as

13 prima facie evidence that the[] [LGN] w[as] defective."  See id. at

14 1193.  The court declines to do that.

15      It is beyond dispute that "a mere 'scintilla' of evidence" is

16 not sufficient "to defeat a properly supported motion for summary

17 judgment[.]"  Fazio v. City & County of San Francisco, 125 F.3d

18 1328, 1331 (9th Cir. 1997) (quoting Anderson, 477 U.S. at 249,

19 252).  "[I]nstead, the nonmoving party must introduce some

20 significant probative evidence tending to support the complaint."

21 Id.  Plaintiffs have not done that.  Accordingly, the court grants

22 summary judgment in Howmedica's favor as to plaintiffs' design

23 defect claims, whether based upon negligence or strict liability.

### ***Conclusion***

25      In sum, the court hereby:

26      (1) DENIES "Defendant Howmedica Osteonics Corp.'s Motion for

27 Summary Adjudication of its to [sic] Motion for Summary Judgment

28 and Motion to Exclude Expert Robert N. Anderson" (doc. 52);

1    (2) DENIES "Defendant Howmedica Osteonics Corp.'s Motion to

2 Strike Plaintiffs' Controverting Statement of Facts in Response to

3 Defendant's Motion to Exclude Expert Opinion" (doc. 60);

4    (3) DENIES "Defendant Howmedica Osteonics Corp.'s Motion to

5 Strike Plaintiffs' Controverting Statement of Facts in Response to

6 Defendant's Motion for Summary Judgment" (doc. 63); and

7    (4) GRANTS "Defendant Howmedica Osteonics Corp.'s Motion to

8 Exclude Plaintiffs' Expert Robert N. Anderson and Motion for

9 Summary Judgment" (doc. 48).  The clerk is directed to enter

10 judgment for Defendant Howmedica Osteonics Corp. And terminate this

11 action.

12    DATED this 27th day of March, 2008.

13

14

15    _____

16    Robert C. Broomfield
      Senior United States District Judge

17

18

19

20 Copies to counsel of record

21

22

23

24

25

26

27

28